A 143953, 3990, and 3032 FLV v. Southern Refrigerated Transport Inc. Argument number 369 is provided. Mr. Dupree, Jr., for rebuttal. Good morning. May it please the Court. Tom Dupree on behalf of Southern Refrigerated Transport, and I have reserved three minutes for rebuttal. Fine. This case involves a claim for lost cargo. The plaintiff, Exel, seeks to recover the value of a lost shipment of pharmaceuticals that was stolen from a rest stop while in transit. This case is a classic example of a dispute that is governed by the Carmack Amendment, the federal statute that provides the exclusive remedy for claims of lost or damaged interstate cargo. The District Court, however, erred by entering judgment in favor of Exel on a state law breach of contract claim. Counsel, if the Carmack Amendment applied, why did your client enter into this agreement? The agreement, the master agreement, Your Honor is referring to? The master agreement concerns a general brokerage agreement between my client and Exel, who is a transportation broker. However, the master agreement did not govern or, frankly, say anything about particular shipments, let alone the liability limits that would apply in an instance of a particular shipment. Why did you enter into the agreement if it has really no meaning? Well, I'm not sure I would say it has no meaning, Your Honor. I think there are many provisions in the agreement that have a lot of meaning and that are enforceable. The one provision that we are saying is not enforceable is the provision in paragraph... Why did you enter into that agreement? We entered into the agreement simply to indicate... With the one provision that's not enforceable, as you say. Well, again, we entered into the agreement to set a generalized brokerage relationship between us and Exel. But anything specific, that wasn't any of the agreement that you entered into? The agreement didn't provide for any specifics as to particular shipments. I thought I was using your terms, specific. That's right. In other words, the agreement basically said we and Exel have agreed to enter into agreement where we will, from time to time, provide transportation services. However, the master agreement didn't identify any particular shipments, any particular clients, any particular limitations of liability. Those are set forth in the Bill of Lading. That confuses me even more. Why do you need to enter an agreement to say that sometime, someplace, we will enter into an arrangement? The reason this is done often in the industry, Your Honor, is simply because it is efficient in cases where... Just as efficient for the broker to call you up and say, hey, I've got a client and I want to have you ship something? Why do you have to enter into an agreement, as you say, with nothing definite? Because there are situations like this one where there are large corporations, large manufacturers that are making many, many shipments on a regular basis throughout different portions of the country. And it would be inefficient to have that manufacturer scour the market to try to find transportation. But the manufacturer isn't doing that, counsel. The broker is doing that. That's right. It would be inefficient for the manufacturer. And your entering into the brokerage agreement would have no effect if the shipper at some point said to the broker, I don't want to do business with you anymore. So you've got this general agreement that really, if I'm following your argument, means nothing. Well, again, Your Honor, I do take issue with the idea that it means nothing. In other words, it did establish a relationship between us and Excel. What we're disputing in this case is the effect of that provision in paragraph 9 that they are relying on in this case that speaks to replacement value. That's the only provision we're talking about, whether it means something or means nothing. What does paragraph 9 on replacement value mean? What it means is it says in a case of lost or damaged cargo. Again, as a general matter, this is not with reference to any specific shipment. That could be the sort of damage that – Replacement value, right? Yes. So the replacement value is the $5 million that the district court found. Well, see, that's where we believe the district court went awry, Your Honor, for several reasons. One is going to Judge Zerhanak's question. We don't believe that that master transportation agreement is enforceable in this case because it relies on a state law breach of contract theory rather than the Carmack Amendment, which looks to the bill of lading. Does the Carmack Amendment apply to brokers? Yes. What do you rely on for that statement? Well, several things, Your Honor. First, there are many cases we cited in our briefs. There's the Eleventh Circuit's decision in the Megatrucks case that applies it to brokers. There is the District of Arkansas's case in the – The Sixth Circuit and the Supreme Court have not applied it to brokers. Is that right? They have not applied it. They certainly haven't said it doesn't apply. And, in fact, if you look at what the Supreme Court has said back from its earliest Carmack decisions and, of course, this Court's more recent decisions in American Synthetics, it has spoken very broadly of Carmack preemption and focused on the nature of the claim rather than the entity that is asserting it. And I think under a straightforward application of what the Supreme Court and this Court have said about how you apply Carmack preemption, namely you ask whether the claim that is sought to be preempted is seeking recovery for the loss of goods or for a distinct obligation. That's the dividing line for preemption. And in this case, as opposing counsel told the district court quite candidly, and we think he got it exactly right, this is a claim for loss of cargo, period. That is the heartland of Carmack preemption. It preempts state law claims for loss of cargo. So to your question, Judge – So when you make an agreement, you're going to have 24-hour constant watch over. This has nothing to do with the agreement. That means nothing. A Carmack amendment still applies. We believe the Carmack amendment applies in that to the extent there is a claim for loss of cargo, it has to be brought under Carmack, not under any state law theory. No matter whether you promise to watch it 24 hours a day and you don't do it. Nothing you enter into has any meaning but the Carmack amendment. It all must be resolved under Carmack. That's right. But I would say, Your Honor, that certainly Carmack contemplates that parties may expressly, in writing, waive the applicability of Carmack. And so if you had a universe where, for whatever reason, the parties wanted to contract around Carmack, the federal statute specifically allows for it. Of course, in this case, there was no express waiver, either in the bill of lading or in the master agreement. Okay. But the purported agreement to have a more secure watch over the cargo because of the prior theft, you're saying is not an explicit exception or waiver of Carmack. That's right. Because it has to be, A, in writing, and, B, express we waive Carmack? Is that language required? Yes. That's exactly right. I would say a few other points. This whole notion about extra security, this all falls in this material deviation argument that they've made, which the district court didn't rule on. But putting that aside, it's inapplicable outside the admiralty context. The only court in more than a century or so of Carmack jurisprudence that has ever applied this doctrine outside the admiralty context is a single district court in New York. And there are numerous cases going the other way. And, frankly, even under the New York court's approach, there would need to be a specific extra fee paid for the additional security in order to get around the general rule. So for many reasons, we don't think that doctrine has any applicability to this case. Does your argument boil down just so, if the master contract you had entered into specifically said, we waive the Carmack amendment, then that provision that Judge Moore cited would be enforceable? The provision about the replacement value? Yes, it would get around the preemption problem. I think they would still have other problems in this case, such as their failure to plead and the standing problems. But as far as preemption goes, yes, if there was express language. So your legal argument is what is missing in this agreement is that they did not specifically or you did not specifically agree to waive the Carmack amendment. Not that you couldn't, but that you didn't. That's certainly a, yes, there are additional arguments we have, Your Honor, but that certainly is the failure to include express waiver language is absolutely a key argument. Anything in statute that says it has to have a specific waiver? Yes, the Carmack itself says that the waiver has to be express and in writing. That's the plain language of Carmack. If I could make one additional point, Your Honor, and this goes to your question about the master transportation agreement having no force or effect. What's going on in this case is that when we arrived to take the shipment, in this case, we were presented with a bill of lading that specifically said that our liability, if this shipment gets lost or damaged, is limited to $56,000. No, it didn't say that. It didn't have the number 56,000. It had these four letters and a dollar sign and 2.40 or something. That's right, Your Honor. And how do we know what those four letters are? I can't even remember what they are. R something. RVNX. It's a term of art. If Your Honor goes on the DOT website, it's a very common. A term of art? Well, it's a term of art in the sense that if Your Honor goes on the DOT Department of Transportation website, it's commonly used in the industry. I'm confident my colleagues. I thought we had actually a factual issue in terms of two different affidavits saying what this RVNX $2.40 meant. I would be very surprised if there was a factual dispute on that point, Your Honor. The phrase RVNX is well known throughout the transportation industry, and Your Honor is correct, by the way, about the $2.40 per pound. I simply did the math. I think it's undisputed, that number and the pound value. But my point, Your Honor, the larger point, of course, is that when we arrived to take the shipment, we were assured, and this was language that Excel itself put into the bill of lading, that they said when you guys take this shipment, if you lose it or it gets damaged, your maximum exposure is $56,000. You're putting words in their mouth. But they did give you a bill of lading where they did have RVNX $2.40. They did. And on the prior shipment that was also lost or stolen, the same $2.40 was there, right? RVNX $2.40. I know there was a capped value in that case, and we paid them out at below that capped value. Yes, but do you know whether it said $2.40 also? Someone gave me the impression in this case that that bill of lading also said $2.40. I'd have to check the prior bill of lading. I don't remember offhand what the pound value was. If it were $2.40, that would suggest is Sandoz shipping the same drugs in each of these shipments, or is this just a standard amount that is put in in all of these bills of lading? I don't think the record would speak to that, Your Honor. The fact is is when we pick up these goods, we don't know what they are. Most we know is that they're coded on a Department of Transportation number code, generally saying these are hazardous or non-hazardous, that sort of thing. But as far as the specifics, these are packed up and boxed by the shipper, and so it's not as though our driver But your agreement here to watch it constantly, you really did know what was in these boxes this time, did you not? I'm not sure the record bears that out, Your Honor. In other words, I don't think we have ever said that we knew, number one, what the specific nature of the shipment was. But I guess more to the point, we certainly had no idea that this was valued, or they claim it, $6 million. The only information we had as to value was the number that they gave us when they said, in effect as we certainly interpret, and I think fairly as any reasonable person in the industry would interpret it, as saying that your liability is capped at $56,000. That was in the bill of lading. They prepared it. Was the bill of lading presented by the broker or by the shipper? The bill of lading was presented to us by the shipper, but it was prepared by the broker. In other words, it is undisputed that the bill of lading was prepared by Excel, which is the plaintiff in this case. But it technically, at least, is the shipper document. Technically, yes. In other words, it reflects the contract of carriage between the shipper and the carrier. And in this case, it specified destination. It specified the maximum release value, which, again, caps our liability in this case. Your red light is on. Thank you. May it please the Court, Mark Rubin on behalf of the appellees from the Specter Rubin Law Firm. I would like to discuss with you amending the contract we have. We need to put a cap on the liability portion of the cargo loss and damage. We have the $250,000 for cargo insurance, but there is no cap. We need to put a cap on liability at $250,000 per occurrence. This is an email from Rodney Danley. This is record reference below 92-2, page ID number 1333. This email is the central point in this case, and I think your Honor has all hit upon it during the appellant's presentation. Why are we entering into a contract that makes us responsible for full replacement costs and then trying every legal maneuver we can to avoid honoring those contractual obligations that Excel believed that SRT entered into in good faith? How about responding to his argument when he says, yeah, that would be a valid agreement if you specifically said in that agreement we're waiving the CARMAC? Well, there would be no reason to waive CARMAC because CARMAC would not apply to a broker's claim under a Master Transportation Service Agreement I. And number two, there's nothing in the CARMAC amendment that would preclude enforcement of the liability provisions of the Master Transportation Service Agreement even with the issuance of the document that they refer to as a bill of lading. Why doesn't CARMAC apply? Well, CARMAC has two purposes underlying this entire red herring of a preemption argument, Your Honor. The first purpose was to make it easier for shippers and consignees, that is the parties who entrusted the cargo and who have an interest in the cargo, it makes it easy for them to go after carriers without having to determine what did they do wrong. And in many instances, you have multiple carriers or you have carriers that are subcontracting it to other carriers. Why doesn't it apply to brokers too? That's a good question, Your Honor, because a broker is not a shipper that's entitled to recover under the direct action of CARMAC and a broker is not a carrier that is entitled to recover under the apportionment section of 14706B. Therefore, they're wholly outside either of those two enabling provisions, and there are no provisions in CARMAC that hold a broker responsible for anything. The only liability provisions that there are in CARMAC deal with freight forwarders and motor carriers. There's a specific definition for what a broker is, and they're outside of all of those provisions. So are there any cases that have applied CARMAC to brokers? Meaning to hold a broker liable under CARMAC? Not that I'm aware of, Your Honor. And what I would like to say is that they try to draw a distinction between all of those cases, and there's a body of law that recognizes why and under what circumstances a broker's claim against a carrier will not be preempted. But I think it's more important to look at what would happen if it were preempted. What would the claim even be? They're not the shipper under the Bill of Lading, and they're not a carrier. So what would the CARMAC claim be if it were preempted? Okay, so moving to a slightly different concern that I have. What is your loss? Sure, understood. Well, there's a couple different points on this issue, and the appellant has raised Article III concerns as well as damage concerns. The concern that hits me right off is that it was Sandoz's drugs that were lost. That's right. And you have not introduced any evidence that you owe Sandoz anything. No, that record was not developed as to whether or not there's been a legal determination of whether we owe it. They have claimed it, and they have preserved their rights against us. But even under the reading of the most favorable case cited by appellant in their brief, the Lujan decision, talking about what the Article III requirements are for standing and injury in fact, what we're talking about is invasion of a legally protected interest, actual or imminent. It does not mean that we have to have paid the loss. It does not mean that the cargo has to be ours. They have put in a claim for us, and we have been deprived of our legal rights under the MTSA. The MTSA provides that when there's a loss, they will pay us. They will pay Excel, not Sandoz. They have not done that. Do you have an obligation? Suppose you were to win this lawsuit and get the $5 million or whatever. The money will go to Sandoz. You have an obligation to pay Sandoz, and what is it that's making you have that obligation? Do you want me to speak to things outside the record below? I can tell you. No, I think we should focus on the record. Sure. That's not developed in the record as to why. We made statements on the record that satisfy the district court that there would be no chance of a double recovery. The court looked at the assignment of rights, meaning that Sandoz assigned all interest that it might have to Excel. But if you're standing in for Sandoz's rights, then doesn't the Carmack Amendment apply? We've got two alternate theories, which the court below recognized, and that's a good point that I'd like to address within my time period here, and then we can get back to some of the preemption issues if that's okay. Even if the court were to determine Excel hasn't suffered damages, Excel's claim should be subject to the Carmack and they have no claim under the Carmack, so Excel's claim is out. Let's look at Excel's assigned claim, which the court dismissed Count 3, which was the direct Carmack action on the basis of enforcing the breach of contract action under Count 4. Were Count 4 not to be upheld by your honors, Count 3 would need to be reinstated, and the result would be the same. And the reason why the result would be the same is because of two factors. Number one, Sandoz is a third-party beneficiary to the agreement. As I stated earlier, under the Carmack Amendment, there is no limitation of liability. Rather, there's a provision that states that it's permissible for a carrier and a shipper to enter into an agreement. That agreement can be by way of contract. It can be by way of bill of lading. It's not specified. It doesn't have to be a bill of lading. It can be, but it can also be by way of separate contract, as it was in this case. But wait a minute. What is the separate contract that Sandoz? The MTSA, Your Honor. Sandoz didn't sign the MTSA. They did not sign it. Let me get back to the point about limitation of liability. In order for this alleged limitation of liability, this 240RBNX, to be enforceable, they have to make the leap that it was a shipper-generated or a shipper-signed bill of lading. They admit that it was actually Excel that generated it, and the record below is clear. Excel actually is the one who signed it. Now, so they want to say that Excel is the agent of Sandoz for purposes of entering into a shipping contract. Okay. They need to do that in order to have a limitation of liability. Well, that also means that Excel was the agent of Sandoz for purposes of entering into the MTSA. And under Ohio law, on third-party beneficiary, it's very permissible to not identify the specific person, as long as it's a class of persons, Even if Sandoz If you're starting to rely on Ohio law and you're relying on Sandoz as the shipper, then you get into the Carmack Amendment saying that we don't allow state law to be utilized as preemptive. Well, I think we would still look at Sixth Circuit jurisprudence on third-party beneficiary law, and the law is pretty much the same. You have a class of persons that the contract clearly illustrates who is going to govern. You also had an onboarding call. This was explained in the Rodney Danley deposition at length. Prior to the first shipment ever being accepted, SRT, contrary to the arguments that were just made, SRT knew that these were pharmaceuticals, and they knew that they could at times have seven-figure values. There was a truckload pricing request document that was exchanged prior to the onboarding call. It states specifically that these are generic pharmaceuticals, and that typically the values will be a million dollars or less. That means sometimes they could be more, but typically they would be less. But it's talking about a million dollars. They knew this before they accepted the very first shipment. And in answer to Your Honor's question earlier, was the 240 RVNX on the bill of lading in the prior loss? Yes, it was. And that's in the record? It is in the record, Your Honor. I have it open on my desk. Okay. Thank you. That's okay. I don't want to take your time. It's in the record. It's in one of the affidavits on the first motion for summary judgment, setting forth the prior claim being paid on that basis. But what my point is, is if they had a 240 RVNX on the bill of lading on the first shipment at the first loss, during the Rodney Danley deposition, and I think it's very important to note this, they claim that Rodney Danley is a low-level sales guy who had no authority to send all these emails asking for an amendment to the contract. That's false. Number one, he's the one who signed the MTSA. And number two, during his deposition, he stated that he went to upper-level management in the wake of the first loss. They were concerned. They instructed him to review the MTSA. He reviewed the MTSA. Upper management reviewed the MTSA. They then directed him and instructed him to reach out to Excel to ask for an amendment to that provision, paragraph 9 of the MTSA, because they were concerned that they didn't have a limitation of liability. And why would they do that if they were relying on the 240 RVNX? So what does the fact that there was a 240 RVNX for both shipments mean? Does it mean that? It doesn't mean anything in terms of limiting the liability of SRT. It was explained both in the affidavits and in the deposition of Excel why that generated. They're required, and in fact it makes sense, to put on this freight receipt document what type of cargo it is. And it's got a classification. That classification is in the computer system of Excel, and it automatically kicks that out. But there are two reasons why the limitation of liability part doesn't matter. Number one, the bill of lading itself, if they want to call it a bill of lading, which we contend that it was being utilized as a freight receipt. They contend it was being utilized as a bill of lading. But if we want to look at the top of that bill of lading, it states that it's received subject to the classifications and tariffs in effect. Well, the classification and tariff that was in effect was the MTSA, so it's subject to the MTSA. How do we know the MTSA is a classification and tariff? Because if we look at the last five pages of that document, it's setting forth what the rates are for the particularized services. So that's what a tariff is. That incorporates the MTSA back into the bill of lading. That's number one. Before we get to number two, unless number two answers my question, why 240 in the two bills of lading? What does it mean in your side's interpretation? The other side says it's the value. Oh, in generic terms, outside of what it means in this shipment? Why 240 rather than $10 or $100? This is the release value rate that's utilized for this type of commodity in other shipments that have nothing to do with this shipment. So this type of commodity is pharmaceuticals. It might have been freight all kinds. It might have been pharmaceuticals. I'm not sure. Does the record indicate why 240 was the number in both? The record indicates that it was already like that in the computer system, and that if they used the number that appears before the RBNX, the commodity classification, that it automatically generated that. And that's in somebody's affidavit or deposition? Yes, Your Honor. That's right. So is there a fact question for the district court to answer as to what the 240 RBNX means? In the original summary judgment hearing, and there were at least two, in the original summary judgment hearing, the court reconciled the affidavits to its satisfaction that 240 RBNX generally is accepted as a limitation of liability. And so you're saying the district court already found facts, but this is just a summary judgment? I think what Your Honor might have been focusing on in the affidavits that created a potential factual issue were that we attacked the affidavit of SRT for lack of foundation in establishing in the record what 240 RBNX meant. The court disagreed with us. So moving back on, if this were a count three Sandoz claim, we believe that Sandoz would clearly be a class of persons identified for the benefit under this agreement, but that even if not, and even if this were a bill of lading, and even if 240 RBNX were established, and even if they were claiming a limitation of liability, that two Northern District of Ohio, two district courts in Ohio have both addressed the material deviation doctrine and appeared to be ready to follow it under the appropriate facts. The one element that was missing from both of those cases which stopped the district courts in Ohio from invalidating the limitation of liability under the material deviation doctrine was the lack of the economic component. Our record below establishes the economic component contrary to the appellant's position, and that is to say that the testimony from SRT's corporate representative on this point was that the reason that they don't provide constant security protocols to all of their customers is because it costs them more to do it. Why did they do it in this case? Well, in order to keep the business. When they were asked specifically did you charge XL for it, he stated that he couldn't remember, but that either he would have charged it or they would have eaten the cost in order to keep the business to accommodate the relationship. The result is the same. There was an economic component that was satisfied. If they voluntarily chose not to issue a bill to keep the business because they were worried about it in the wake of the first loss, that doesn't matter. So there are two district court of Ohio cases where they have recognized the application of this principle under the right set of facts. So even if this were a... So we're obviously supervising them, two district courts of Ohio. Of course. So have there been any courts of appeals or the Supreme Court or the Sixth Circuit in particular that have recognized this applying outside of admiralty? No, Your Honor. It was good to be the first. Thank you. Thank you, Your Honors. Just a few brief points by way of rebuttal. First, Judge Moore, you asked the question about whether Sandos, excuse me, Excel had suffered any injury, and the answer is clear. They have not. In fact, the district judge asked the exact question Your Honor asked, and it appears at page 2126 of the record where the district court said, in your agreement with Sandos, do you agree to pay them full value if cargo is lost? And Mr. Rubin said, we have not developed that record, Your Honor. I can't speak to that. I don't know that the liabilities are the same. That's what he told the district court. And I think what's going on here is fairly self-evident is that Excel is trying to get a windfall. They are trying to reap a $6 million award in a circumstance where they have not established, there's nothing in the record, as he concedes, that they have suffered a penny of loss in this case. They are trying to get a $6 million windfall, and we don't believe that this court should allow it. Isn't there a possibility that Sandos will go after Excel? I admit there's a possibility. There was an argument in the record, or there was evidence in the record, that Sandos had asserted a claim, not a formal claim, but a demand against Excel. Exactly, exactly. And Excel disputes that. Excel disputed that. And so what counsel is saying today about, well, we're going to give all the money to Excel, at least that's inconsistent with what he told the district court. The other point I would like to make goes to the question of preemption, and it's this. Counsel suggested that CARMAC preemption, that there's no CARMAC claim because this is a broker and that brokers are somehow outside the universe of the CARMAC amendment. But that's not correct. If the court were to look at the dozens of cases that have been cited in the party's briefs concerning the application of the CARMAC amendment in the broker context, what they all say is they say the test for preemption is simply whether the broker is asserting a claim for loss of cargo or for something independent. We keep saying the CARMAC amendment. Can you give me a statutory provision that would show that a broker is either covered by the CARMAC amendment or a broker has rights under the CARMAC amendment? Well, certainly the statute itself doesn't speak to brokers. The statute in question, of course, 49 U.S.C. 14706. It does not, by its terms, speak to brokers. But I would submit that the question of preemption, of course, is not discussed in the statute. It's something that's been developed in a very robust body of common law, beginning with the Supreme Court's earliest decisions in Adams Express and Georgia and Florida Railway and followed through in this court's decision in American Synthetics. What all of these courts have universally said as to the test for preemption is look at the nature of the claim that's being asserted. If it's a claim for loss of cargo, it's preempted by CARMAC. If it's something other than a claim for loss of cargo, it's not preempted. That's the universal rule that all the federal courts have been applying for decades. But I could see, hypothetically, that the CARMAC amendment could apply to all shipper and carrier interrelationships but not to brokers. And so that if a broker actually has a loss of cargo claim, hypothetically, that the broker might claim might not be covered within CARMAC and therefore might not be preempted by CARMAC and be left to state law. I could see that, hypothetically, as a law, a rule. I understand that that point, Your Honor, is articulating. I think my first response is that is a question that literally dozens of federal courts have addressed. And I'm not aware of any of those federal courts that simply says brokers are carved out. Again, this is not something new. But in terms of courts of appeals or the Supreme Court, they don't say brokers are covered. They are silent on brokers. It's all these district courts, isn't it? Well, there's the Eleventh Circuit's decision in the Megatrucks case, and that concerned a broker. So that's that one you cited in your original argument? Yes. That's the case? That's in there. Yes. But, again, I would submit that this is something, even though I take Your Honor's point, that there's not robust case law in the question of broker coverage at the circuit court level. There are probably dozens of district court decisions, and I'm not aware of a single one that simply carves out brokers because what they all focus on is what the Supreme Court has always said is focus on the nature of the claim. And when one focuses on the nature of the claim, it doesn't matter who is asserting this claim. The purpose of CARMAC, of course, was to ensure predictability and certainty in a carrier's liability. Carriers had to surrender certain defenses that were traditionally available in common law, but in exchange they got something valuable, which was predictability and certainty. We submit that the district court's decision in this case undermines all of those concerns about predictability, about certainty, because it disregarded the plain language of limitation set forth in the Bill of Lading, which under CARMAC, carriers and shippers are entitled to limit their liability in the Bill of Lading that's specifically allowed under federal law, and that's not something that can be trumped by state laws the district court permitted to occur in this case. Thank you. Thank you.